(No. 2734—

NELLIE FINKLER, ADMINISTRATRIX OF THE ESTATE OF ALEXANDER C. FINKLER, DECEASED, Claimant, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed September 13, 1939.*

M. D. MORAN, for claimant.

JOHN E. CASSIDY, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

MR. JUSTICE LINSCOTT delivered the opinion of the court:

The claimant, Nellie Finkler, is the widow of Alexander C. Finkler and has filed a claim with this Court for an award under the Workmen's Compensation Act. The claim was filed on October 2, 1935, and the claimant filed briefs on September 22, 1938. The State filed its brief on March 17, 1939.

The record shows that the deceased was an attendant at the Manteno State Hospital, and on December 29, 1934, about 11:00 a. m. a patient was received at the hospital and while the attendant, Lyle Bauer, was taking care of him the patient broke loose and ran down the stairs. The attendant grabbed him around the waist and the deceased, Alexander C. Finkler, went to the bottom of the stairs to help subdue the patient. Finkler was knocked down on the floor on his back and the patient and the attendant Bauer fell on top of him. Finkler had been assigned to the ward as an attendant. The institution at Manteno, Illinois, has a power house in which there is electrical machinery, and they also have lathes and saws and other kinds of machinery.

Dr. Arthur H. Gollmar was regularly employed at this institution and was on the staff of the Manteno State Hospital. He is a graduate of Rush Medical College and was licensed in the State of Illinois in 1900, and devotes all of his time to this institution. At the time his testimony was taken he was devoting all of his time to psychiatry, and had been on the staff of the hospital seven years and two months. He had first seen the deceased when he was required to examine him, an examination being made of all new employees. He found the deceased to be under-developed and undernourished and a rather frail man, who had a hernia and mitral murmur and some rales in the chest. He had what the doctor called

an emphysematous condition of the chest. He looked rather pale and was classified as "poor." He made out an injury report which was dated December 29, 1934. They were not prepared at the Manteno State Hospital at that time to take care of injury cases. They had one ward on the male side and one ward on the female side. On the day of the injury Dr. Gollmar saw the deceased and spoke to him, and then the doctor went up to the infirmary department. He then learned that the claimant's intestate had been injured; that is, knocked over, and the doctor went down and inquired about his condition. The deceased said he was all right and that he did not get hurt, and further said: "I can take it; it's nothing." The doctor suggested that he look him over and the deceased said, "There's no need." The doctor made no further examination at the time because the deceased did not report disability and kept on working. About a week after that the doctor was called up to Brandon Hall, a dormitory there, and found the deceased in bed. He wasn't feeling well and reported off duty. The deceased had a temperature of about a degree and some rales in the chest. He did not seem to be in any great pain, but mentioned that his back hurt him, and the doctor rolled him over in bed. He examined the spine by pressure and feeling with his hands and palpated him. He found no fracture. Treatment was given for his acute indisposition and the patient was confined to his bed. No opiates were given. It was customary to send patients to Kankakee State Hospital, and this doctor discussed that with the deceased, but the deceased did not feel that he was sick enough or injured sufficiently to go to Kankakee State Hospital.

There were no X-ray facilities at the hospital. The Manteno State Hospital was more or less in a state of organization in 1934 and 1935. At that time the hospital had eight two-story cottages and twelve or thirteen hundred patients, and not more than three doctors.

No objective symptoms of pain were found, but the patient had subjective symptoms of pain. Nothing was said about the pain in his back until about a week after the injury. Heat treatments were given which seemed to help at first. At the time of the injury Finkler did not report any disability. He had previously had lumbago.

At the time of his death Finkler was married, but had no children under sixteen years of age.

The deceased started to work in this department on November 14, 1934, and continued to perform his regular duties until January 4, 1935. He was paid $45.00 per month and each six months they received a $2.00 a month raise until they got $60.00 per month. His salary had been raised to $52.00 per month. His wife, Nellie Finkler, was similarly employed. The chief nurse at the institution had been notified that the deceased was unable to work, but she knew about it at the time. Prior to Mr. Finkler's employment at the institution he had been a cigar salesman. Finkler was about 70 years of age. He had enjoyed good health prior to the injury and his wife testified that he had no illness for a year prior to the injury, and she could not recall of Mr. Finkler having been in bed on account of illness for perhaps thirty years, and then for tonsilitis.

Mr. Finkler was taken away from the institution on January 30, 1935, to his home in LaSalle, Illinois, where he remained until his death. He stayed in bed and was unable to sit up. He couldn't sit on a chair. Dr. Haskins of LaSalle took care of him. Dr. Haskins was asked the following question:

"Q. Did you form any opinion from the statements he made to you as to how he was injured—or did you form any opinion as to whether or not his injury caused any aggravation of the condition he had in his back—did you form an opinion? Answer, yes or no.

A. Yes.

Q. What is that opinion?

A. I think that the injury hastened the man's death. He was a man along in years, between 65 and 70, and I would say definitely that his alleged injury aggravated that condition. A man approximately 73 years of age who receives a fall or who was knocked down to the floor, having a tubercular spine or condition he may have had to the spine prior to this injury would, in my opinion, cause an increase or accelerate the tubercular condition of the spine."

Dr. Haskins was of the opinion that the cause of deceased's death was due to tuberculosis, which was evidently present in his chest and back, and to pernicious anemia, combined with his age and the condition of a person's heart at

this age, but he was of the opinion that the injury aggravated all of these things, and that the deceased might have gone on indefinitely if the injury had not arisen.

The evidence showed that the deceased had been knocked to the floor and that an attendant and a patient had fallen upon him as he lay on his back.

"Claimant's Exhibit 2" is an X-ray film taken of the deceased under the direction of Dr. Haskins, and this plate had either been mislaid or lost in Dr. Haskins' office or in St. Mary's Hospital in LaSalle, Illinois. The doctor had examined this plate, and he testified that if the deceased had received a trauma to the back, in his opinion, that would have contributed to the condition found in the X-ray plate. This doctor also testified that he believed that the injury that the deceased received to the first and second processes resulted in the deceased's death. The doctor said: "I think it was the main factor in the death of the deceased."

It has been held on numerous occasions that when a person has a pre-existing disease, and that disease is aggravated or accelerated in the course of employment by accidental means, and death results therefrom, that death results from the injuries caused by the accident.

In the case of *Cameron, Joyce & Co.* vs. *Industrial Commission*, 324 Illinois, 497, it was held that where an employee of a road construction company dies of valvular heart trouble within five months after his left arm and foot had been crushed under the wheels of a heavy road grader, a finding that the injury contributed to the employee's death is warranted where the evidence shows that although the employee had chronic heart trouble he had always been able to work up to the time of his injury, and that although he made satisfactory recovery from the local injuries to his arm and foot he continued to suffer pains in his chest, back and side, which constantly increased in severity.

In the case of *Valier Coal Co.* vs. *Industrial Commission*, 339 Illinois, 458, it was held that an award of compensation for the death of an employee a little more than a year after he was severely injured by the falling of coal upon him while in the course of his employment will be sustained where the weight of the testimony is to the effect that while death was due to myocarditis, which may have resulted from a syphilitic condition which existed prior to the injury, the injury accel-

erated and aggravated the heart condition, some experts testifying that the myocarditis was caused by an infection of the lung, resulting from the injury.

Many other authorities may be cited sustaining this proposition of law.

The deceased suffered the accident December 29, 1934, continued to work until January 4, 1935, remained at Manteno State Hospital until January 30th, when he was taken to his home at LaSalle, where he died April 16, 1935.

Attendants at State institutions receive $45.00 per month for the first six months and $46.80 per month for the second six months, and in addition maintenance valued at $24.00 per month, or a total of $838.80 per year.

The Court finds that the deceased received an injury arising out of and in the course of his employment; that the respondent received due notice of this injury.

We have heretofore held that employees in State hospitals for the insane are entitled to the benefits of the Workmen's Compensation Act.

> *Crawford* vs. *State*, 8 C. C. R. 639;
> *Whalen* vs. *State*, 9 C. C. R. 541;
> And numerous other cases.

Deceased left a widow, but no children under sixteen years of age that he was under legal obligation to support. Under Section 7 of the Workmen's Compensation Act, his widow is entitled to recover a sum equal to four times his average annual earnings, but not less in any event than two thousand five hundred dollars and not more in any event than four thousand dollars, and any compensation payments other than necessary medical, surgical or hospital fees or services shall be deducted in ascertaining the amount payable on death.

Deceased's total salary, including maintenance, amounted to $838.80 per year, or $16.13 per week, and the compensation is, therefore, payable at the rate of $8.07 per week. He had been paid for thirty days' non-productive time or the sum of $45.00. He was idle 15 2/7 weeks from December 29, to April 16th, when death ensued. The total compensation will be four times the yearly rate of $838.80, less the sum of $123.35 which had accrued up to the time of death, or the sum of $3,231.85. This is to be paid to the widow in weekly installments of $8.07. There is as of this date September 12,

1939 accrued the claimant 229 weeks at $8.07 per week, or the sum of $1,848.03, leaving a balance of $1,383.82, which shall be paid to the claimant at the rate of $8.07 per week, commencing September 19, 1939.

It appears that the hospital bill at LaSalle has been paid. It also appears that Dr. Haskins was a physician of their own choice, and that the deceased was receiving medical care at Manteno State Hospital by Dr. Gollmar, a physician employed by the State. Therefore, nothing can be allowed for ·the physician for the reason that the deceased was under the care of Dr. Gollmar at Manteno State Hospital and was removed to LaSalle, Illinois, so as to be near his own physician.

This award being subject to the provisions of an Act entitled "An Act Making an Appropriation to Pay Compensation Claims of State Employees and Providing for the Method of Payment Thereof," approved July 3, 1937 (Session Laws 1937 page 83), and being subject further to the terms of an Act entitled "An Act Making Appropriations to the Auditor of Public Accounts for the Disbursement of Certain Moneys Until the Expiration of the First Fiscal Quarter After the Adjournment of the Next Regular Session of the General Assembly" (Senate Bill 123 as amended) approved July 8, 1939;—and being, by the terms of the first mentioned Act, subject to the approval of the Governor, is hereby, if and when approval is given, made payable from the appropriation from the General Revenue Fund in the manner provided for by the foregoing Acts.